UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
ROBERT RODRIGUEZ, et al.,                                               :
                                                                        :
                              Plaintiffs,                               :
                                                                        :
               -v-                                                      :    17-CV-4344 (JMF)
                                                                        :
BEN CARSON, in his official capacity as Secretary of                    :    OPINION AND ORDER
Housing and Urban Development, et al.,                                  :
                                                                        :
                              Defendants.                               :
                                                                        :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

The United States Housing Act of 1937 establishes a complex scheme of financial assistance to low- and middle-income renters. Section 8 of the Act ("Section 8"), codified as amended at 42 U.S.C. § 1437f, provides for — among other types of aid — "project-based assistance," pursuant to which the federal government, through state and local agencies, subsidizes rental units on a project- or development-wide basis. Under certain circumstances, an owner of such a development can opt out of the program and "convert" the development into unsubsidized, market-rate housing. When that happens, tenants may remain in their apartments and receive tenant-specific financial assistance through Section 8's "Enhanced Voucher" program. Section 8(t) of the Housing Act, codified at 42 U.S.C. § 1437f(t),[1] governs how much such tenants have to pay toward their rent. The United States Department of Housing and Urban Development ("HUD") has long interpreted that provision to mean that, when an Enhanced Voucher recipient's income falls by a certain amount, the statute prescribes that the tenant must

---

[1] For ease of reference, the Court will cite to the applicable provisions of the Housing Act as they appear in the United States Code. *See* 42 U.S.C. §§ 1437 *et seq.*

permanently pay the same percentage of monthly income in rent that she had paid at the time her building was "converted." As described below in more detail, the net effect of that interpretation is that a participating tenant whose income decreases by the requisite amount but later recovers can end up paying more than she would have paid if her income had never declined at all.

The question presented here — which arises on cross-motions for summary judgment and appears to be one of first impression — is whether HUD's interpretation of Section 1437f(t) is correct. Plaintiffs Robert Rodriguez, Elaine Pinnock, and Jovanny Pichardo are participants in the Enhanced Voucher program who experienced significant, but temporary, dips in their monthly income. Now that their incomes have recovered, HUD's interpretation of Section 1437f(t) requires two of them to pay more in rent than they would have had to pay had their incomes remained the same all along — a result that Plaintiffs believe is inconsistent with the statute. They bring this action under 42 U.S.C. § 1983 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, seeking declaratory and injunctive relief against two federal Defendants — HUD and its Secretary, Ben Carson (together, the "Federal Defendants") — and two local Defendants — the New York City Department of Housing Preservation and Development ("HPD") and its Interim Commissioner, Eric Enderlin (the "City Defendants"). *See* Docket No. 50 ("Am. Compl."), ¶¶ 61-71.[2] Plaintiffs argue that Defendants' implementation of the Enhanced Voucher program violates both Section 1437f(t) and the Constitution's equal protection guarantees. *See id.* ¶¶ 1-2.

---

[2]  In their Amended Complaint, Plaintiffs named as a Defendant HPD's then-Commissioner Maria Torres-Springer, but it appears she no longer holds that office and that Eric Enderlin now serves as Interim Commissioner. *See* https://www1.nyc.gov/site/hpd/about/senior-team.page. Accordingly, Interim Commissioner Enderlin was automatically substituted as a Defendant by operation of Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d).

For the reasons stated below, the Court agrees with Plaintiffs that HUD's interpretation is inconsistent with the plain language of the Housing Act (and thus does not reach Plaintiffs' constitutional claims). In particular, HUD misreads Section 1437f(t)(1)(D) — which sets a *maximum* rent payment for tenants whose incomes have declined the requisite amount — as though it imposes a minimum as well. And HUD ignores the background statutory provision that sets the rent payment obligations for *all* Enhanced Voucher recipients, subject to a minimum and, when applicable, a maximum. The upshot is that, by misreading the statute, HUD is requiring two of the Plaintiffs to pay more than the statute says they should have to pay. (As discussed below, the rent of the third Plaintiff is unaffected.) It follows that those Plaintiffs are entitled to a declaratory judgment against the Federal Defendants. By contrast, the Court concludes that there is no basis or need to award relief separately as to the City Defendants, both because the claims against those Defendants fail as matter of law and because they are required by law to enforce the applicable federal standards, which the Court clarifies today.

## BACKGROUND

The Court begins with a description of the relevant statutory scheme and HUD's interpretation of it, and then turns to the facts relevant to each of the Plaintiffs. The relevant facts, drawn from the Amended Complaint and admissible materials submitted in connection with the pending cross-motions, are either undisputed or construed in the light most favorable to the non-moving party. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019). As it happens, the facts relevant to the disposition of these cross-motions are all undisputed.

**A. The Statutory Scheme and HUD's Interpretation**

HUD provides housing rental assistance to low-income families through the Section 8 housing program. *See* 42 U.S.C. § 1437f(a). The program is funded by the federal government,

3

but administered by local public housing authorities — in New York City's case, by HPD. *See, e.g.*, *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1152 (9th Cir. 2011). Congress enacted this program "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). Generally speaking, Section 8 offers two types of housing assistance: first, "tenant-based" assistance, pursuant to which HUD provides vouchers to tenants, who can then use those vouchers to pay rent at the housing unit of their choosing, *see* 42 U.S.C. § 1437f(f)(7), (o); 24 C.F.R. § 982.1(b); and second, "project-based" assistance, pursuant to which owners of housing units enter into long-term contracts with HUD to rent the units to low-income families meeting Section 8 eligibility requirements in exchange for rental assistance from the government, *see* 42 U.S.C. § 1437f(b), (f)(6); 24 C.F.R. §§ 886.309, 886.311. Under both forms of assistance, tenants are required to pay a statutorily prescribed portion of the rent, usually thirty percent of the tenant family's "adjusted income" or ten percent of their gross income, whichever is greater. *See* 42 U.S.C. § 1437f(o)(2); *see also id.* § 1437a(a)(1).[3] The federal government then pays the balance of the rent up to a statutorily capped amount. *See* 42 U.S.C. § 1437f(c), (o)(1)-(2).

Beginning in the late 1980s, the long-term, project-based assistance contracts between housing project owners and HUD began to expire in large numbers. Congress was apparently concerned that those housing project owners would decline to renew or otherwise opt out of their contracts with HUD and raise rents to market-based rates that exceeded Section 8's limits on federal housing assistance payments, thereby forcing out low-income tenants in large numbers. *See Park Vill. Apartment Tenants Ass'n*, 636 F.3d at 1152-53. In response, Congress enacted —

---

[3] A family's "adjusted income" is defined as the family's income "after" certain specified "income exclusions." *See* 42 U.S.C. § 1437a(b)(5).

4

among other measures — the Enhanced Voucher program. *See* Preserving Affordable Housing for Senior Citizens and Families into the 21st Century Act, Pub. L. No. 106-74, § 538, 113 Stat. 1100, 1122 (1999). The program requires the HUD Secretary to provide "enhanced vouchers" to tenants residing in housing units whose owners have elected not to renew their project-based assistance contracts on the date the contract expires, 42 U.S.C. § 1437f(t)(1)(B), (2); *see also* Pub. L. No. 106-74 § 531, 113 Stat. at 1113, codified at 42 U.S.C. § 1437f note — an event called a "conversion."

Section 1437f(t) establishes the relevant rules governing enhanced vouchers. It provides, in relevant part:

> Enhanced voucher assistance under this subsection for a family shall be voucher assistance under subsection (o), except that under such enhanced voucher assistance —
>
> > (A) subject only to subparagraph (D), the assisted family shall pay as rent no less than the amount the family was paying on the date of the eligibility event for the project in which the family was residing on such date; . . . [and]
> >
> > (D) if the income of the assisted family declines to a significant extent, the percentage of income paid by the family for rent shall not exceed the greater of 30 percent or the percentage of income paid at the time of the eligibility event for the project.

42 U.S.C. § 1437f(t)(1). Section 1437f(o), in turn, provides in relevant part that the rent "[f]or a family receiving project-based assistance . . . shall be determined in accordance with section 1437a(a)(1) of this title." *Id.* § 1437f(o)(2)(C). And finally, Section 1437a(a)(1) provides, in relevant part, that "a family shall pay as rent for a dwelling unit assisted under this chapter (other than a family assisted under section 1437f(o) . . . of this title . . . )" the higher of "30 per centum of the family's monthly adjusted income" or "10 per centum of the family's monthly income." *Id.* § 1437a(a)(1). For purposes of these Sections, "family" is defined to include individual tenants receiving project-based assistance. *See* 24 C.F.R. §§ 5.100, 5.403, 886.302.

5

In 2001, HUD issued a memorandum, titled Notice PIH 2001-41, Section 8 Tenant-Based Assistance (Enhanced and Regular Housing Choice Vouchers) for Housing Conversion Actions — Policy and Processing Guidance (the "2001 Notice"), providing guidance on the interpretation of Section 1437f(t). *See* Docket No. 76, also available at https://www.hud.gov/sites/documents/DOC_9111.PDF. To the extent relevant here, the 2001 Notice provides that "[i]f an enhanced voucher family suffers a significant decline in family income" — defined as "a decrease in gross family income of at least 15 percent from the gross family income on the date of" conversion — "the minimum family share required of the family shall be reduced so that the percentage of income for rent does not exceed the greater of 30 percent or the percentage of monthly adjusted income actually paid by the family for rent (the rent to owner plus tenant-paid utilities) on the effective date" of the conversion. *Id.* at 31. The 2001 Notice states that a "significant decline in family income" triggers "a different method for calculating the family's enhanced voucher minimum rent. The enhanced voucher minimum rent changes from an actual dollar amount to a specific percentage of income." *Id.* According to the 2001 Notice, that new minimum is the greater of the percentage of "monthly adjusted income" that the family was paying at the time of the conversion or thirty percent of the family's current "adjusted monthly income." *Id.* at 31-32. And, the 2001 Notice provides, "[o]nce this change in the enhanced voucher minimum rent becomes effective for a family, the enhanced voucher minimum rent for the family remains that specific percentage of income (e.g., 32 percent) and will not revert to a specific dollar amount, even if the family income subsequently increases or decreases." *Id.* at 32.[4]

---

[4] HUD is authorized to waive "handbook provisions" like the 2001 Notice's interpretation of Section 1437f(t). *See* 42 U.S.C. § 3535(q)(4); 24 C.F.R. § 5.110; Docket No. 77 ("Fed. Defs.' Mem."), at 8. HUD's procedures for issuing such "good-cause waivers" direct local housing authorities like HPD to initiate the requests; as the Federal Defendants explain in their brief, they

6

According to HUD's interpretation of the statute, then, if the income of a family participating in the Enhanced Voucher program declines by fifteen percent or more, the statute locks in a new rent-payment rate that remains in place even if the family's income goes up thereafter. Moreover, because the new calculation is percentage-based, that means that a family's rent payment increases as the family's income increases, to the point where the payment can even exceed what the statutory maximum would have been had the family not experienced an intervening "significant decline" in income. And, if the family's rent payment increases to the point where it exceeds the actual contract rent of the family's housing unit, the family will stop being eligible for Section 8 housing aid altogether. *See, e.g.*, Docket No. 72 ("Ruiz Decl."), Ex. F, at 16. Thus, HUD interprets the statute governing Section 8's Enhanced Voucher program to provide *more* generous housing aid to families whose income has never dropped by fifteen percent or more than to families that have experienced such financial shocks. Put differently, a family that experiences a "significant decline in income" can end up receiving much less in federal housing aid than a family whose income has stayed constant or grown.[5]

## B. Factual Background

Each of the three Plaintiffs — Robert Rodriguez, Elaine Pinnock, and Jovanny Pichardo — lives in a Manhattan building that used to be subsidized by HUD as a "project-based"

---

have taken the position in this litigation that if HPD were to confirm the facts alleged in the Amended Complaint and seek good-cause waivers on Plaintiffs' behalf, such waivers would be forthcoming, meaning that Plaintiffs would be restored to the position they would have been absent the intervening "significant" decline in income. *See* Fed. Defs.' Mem. 8. Needless to say, HPD has not sought such waivers here, and indeed, "has never sought one for an Enhanced Voucher holder." Docket No. 90, at 2. In any event, in light of the Court's resolution of this case on statutory grounds, the Court need not and does not address Plaintiffs' contention that HPD's refusal to seek good-cause waivers constitutes an equal protection violation.

[5] In 2016, HUD published a proposed rule that would have revised this interpretation, but the proposed rule has not been adopted. *See* Tenant-Based Assistance: Enhanced Vouchers, 81 Fed. Reg. 74372, 74381-82 (Oct. 26, 2016); Fed. Defs.' Mem. 7 n.2.

7

development through New York's Mitchell-Lama program. *See* Docket No. 50 ("Am. Compl."), ¶ 3; *see Junior v. City of New York*, No. 12-CV-3846 (PAC), 2013 WL 646464, at *1 & n.1 (S.D.N.Y. Jan. 18, 2013) (describing the Mitchell-Lama program).

Rodriguez has lived in his apartment for forty-one years. *See* Am. Compl. ¶¶ 7, 33. In 2004, the owner of Rodriguez's building opted out of the Mitchell-Lama program and converted the building to market-rate rentals. *See id.* ¶ 34. At the time of the conversion, Rodriguez's adjusted monthly income was $780 and his monthly rent was $671 — eighty-six percent of his adjusted monthly income. *See id.* ¶ 35. In 2009, Rodriguez's monthly adjusted income dropped to $352 (a decrease of fifty-five percent), at which point HPD adjusted his rent payment to $303 per month, or eighty-six percent of his monthly adjusted income. *See id.* ¶ 37. Rodriguez's income has since increased, such that when HPD recertified his Enhanced Voucher status in 2016, HPD's application of the eighty-six percent figure yielded a rent share of $1,400 per month — $729 more per month than he had paid before his income had declined. *See id.* ¶¶ 36, 38. Rodriguez could not afford to pay that amount, and his landlord has since brought summary eviction proceedings against him in New York Housing Court. *See id.* ¶¶ 38-40.

Pichardo has lived in her apartment for sixteen years. *See id.* ¶ 50. In 2005, the owner of Pichardo's building opted out of the Mitchell-Lama program and converted it to market-rate rentals; at the time, Pichardo's adjusted monthly income was approximately $913, and her monthly rent was $429 — or forty-seven percent of her income. *See id.* ¶¶ 51-52. In 2008, Pichardo's adjusted monthly income dropped to $393 per month; because that was a decline of more than fifteen percent, HPD recalculated her rent and set the new rent payment at forty-seven percent of her adjusted monthly income, which then came to $185 per month. *See id.* ¶ 54. Pichardo's adjusted monthly income remained below $393 until 2014, when it increased to $502.

*See id.* ¶ 56. In 2016, it increased again to $4405 per month, and HPD calculated her monthly rent share using the forty-seven percent figure to be $2,030. *See id.* ¶¶ 56-57; Ruiz Decl. ¶ 39. As of June 2018, Pichardo's income had increased to the point where the forty-seven percent calculation yielded a number that exceeded her apartment's contract rent, threatening her eligibility for the Enhanced Voucher program. *See* Ruiz Decl. Ex. F, at 16.

Finally, Pinnock has lived in her apartment for forty-one years. *See* Am. Compl. ¶ 41. Her landlord opted out of the Mitchell-Lama program in 2003, when her rent was $613 — eighty-three percent of her monthly income. *See id.* ¶¶ 42-43. In 2004, Pinnock experienced a significant drop in income, and HPD — apparently in error, given HUD's 2001 Notice — recalculated her rent at thirty percent of her income. *See id.* ¶ 45. In 2010, HPD recalculated Pinnock's rent payment in accordance with the 2001 Notice, permanently resetting it at eighty-three percent of her monthly adjusted income. *See id.* ¶¶ 45-46. Pursuant to that formula, as of June 2017, Pinnock's monthly rent obligation was $603. *See* Ruiz Decl. Ex. E, at 11.

## DISCUSSION

### A. HUD's Interpretation Is Inconsistent with the Statute

This case turns on the proper construction of Section 1437f(t), which is a pure matter of law and appears to be a matter of first impression. *But cf. Junior*, 2013 WL 646464, at *6 (discussing Section 1437f(t)(1) in dictum).[6] "Statutory interpretation," of course, "always begins with the plain language of the statute." *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 427 (2d Cir.

---

[6] Because the dispositive issue is one of law, and because the relevant facts are undisputed, the Court need not dwell on the applicable standard of review or the scope of the record. *See generally New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 630-35 (S.D.N.Y. 2019) (discussing the "record rule" in APA cases), *cert. before judgment granted*, 139 S. Ct. 953 (2019). Either way, "the entire case on review is a question of law." *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (internal quotation marks omitted).

9

2009) (per curiam) (internal quotation marks omitted). In interpreting the language, however, the Court must consider "not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme." *Hedges v. Obama*, 724 F.3d 170, 189 (2d Cir. 2013) (internal quotation marks omitted). That is, "[i]t is one of the most basic interpretive canons that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Id.* (internal quotation marks and alterations omitted); *see, e.g.*, *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) ("A fair reading of legislation demands a fair understanding of the legislative plan."). At all times, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Hedges*, 724 F.3d at 189 (internal quotation marks omitted).

Applying those principles here, the Court concludes that HUD's interpretation of Section 1437f(t), however longstanding it may be, is wrong.[7] The Court begins with the principal language of Section 1437f(t), which provides as a general rule that Enhanced Voucher assistance "*shall be voucher assistance under subsection (o)*," thereby incorporating by reference Section 1437f(o)'s prescription as to the amounts that Enhanced Voucher recipients must pay. *Id.* § 1437f(t)(1) (emphasis added). Section 1437f(o), in turn, cross-references and imports the

---

[7] The Federal Defendants concede that HUD's interpretation is not entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See* Fed. Defs.' Mem. 10. Instead, they ask for deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), "[t]o the extent this Court determines that the at-issue language . . . is ambiguous." Fed. Defs.' Mem. 16; *see id.* at 10. Because the Court concludes that the relevant statutory language is unambiguous, the Court accords no deference to HUD's interpretation. *See, e.g.*, *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 509 (2d Cir. 2017) (noting that a court may "defer to the agency's interpretation under the *Skidmore* standard only when the statutory language at issue is ambiguous").

formula set forth in Section 1437a(a)(1). *See id.* § 1437f(o)(2)(C). There, finally, one finds a straightforward formula: As relevant here, Section 1437a(a)(1) provides that an Enhanced Voucher recipient "*shall pay* as rent" the higher of "30 per centum of . . . monthly adjusted income" or "10 per centum of . . . monthly income." *Id.* § 1437a(a)(1) (emphasis added).[8]

That is not the end of the matter, however. Pursuant to Section 1437f(t)(1)'s plain terms, the default formula furnished by Section 1437a(a)(1) is subject to the "except[ion]" set forth in Section 1437f(t)(1)(A), which, in turn, is "subject" to Section 1437f(t)(1)(D). Critically, though, those subsections do not prescribe a new formula for calculating an Enhanced Voucher recipient's rent in all instances. Instead, Subsection (A) provides that an Enhanced Voucher recipient may not pay "less than the amount" he or she was paying in rent at the time his or her building was converted, thereby setting a floor below which the rent prescribed by Section

---

[8] On its face, Section 1437a(a)(1) seems to exclude "famil[ies] assisted under section 1437f(o)" from its formula. *See* 42 U.S.C. § 1437a(a)(1) (providing that "a family shall pay as rent for a dwelling unit assisted under this chapter (*other than a family assisted under section 1437f(o) . . . of this title . . .* )" the higher of "30 per centum of the family's monthly adjusted income" or "10 per centum of the family's monthly income" (emphasis added)). The parties nevertheless agree that Section 1437a(a)(1)'s formula applies to Enhanced Voucher recipients by way of Section 1437f(o)(2). *See* Fed. Defs.' Mem. 5; Docket No. 87 ("Pls.' Mem."), at 6. Even without the parties' agreement, however, the Court would conclude that Section 1437a(a)(1)'s formula applies to Enhanced Voucher recipients for two independent reasons. First, Enhanced Voucher recipients are "assisted under" Section 1437f(t), not 1437f(o); the fact that Section 1437f(t) imports Section 1437f(o)'s background formulas by cross-reference does not change that. And second, even if Enhanced Voucher recipients *were* one type of family "assisted under section 1437f(o)" — as families to whom Section 1437f(o)(2)(C) otherwise applies presumably are — then Section 1437f(o)(2)(C)'s more specific command that "the rent that [a family receiving project-based assistance] is required to pay shall be determined in accordance with section 1437a(a)(1)" would control notwithstanding Section 1437a(a)(1)'s seemingly conflicting, but more general, statement that its formula does not apply to families "assisted under section 1437f(o)." *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (noting that "[i]t is a commonplace of statutory construction that the specific governs the general," and therefore, where "a general permission or prohibition is contradicted by a specific prohibition or permission[,] . . . [t]o eliminate the contradiction, the specific provision is construed as an exception to the general one" (alterations and internal quotation marks omitted)).

1437a(a)(1) cannot fall. *Id.* § 1437f(t)(1)(A). Subsection (D), in turn, provides a maximum that applies when "the income of the assisted family declines to a significant extent": In that instance, the family's rent share "shall not exceed the greater of 30 percent or the percentage of income paid at the time" of conversion. *Id.* § 1437f(t)(1)(D).

HUD errs by reading Subsection (D) to provide a new formula that kicks in when "the income of the assisted family declines to a significant extent" and then applies at *all* times thereafter. On HUD's reading, that is, the formula in Subsection (D) displaces the formula set forth in Section 1437a(a)(1) for any family whose income drops by a sufficient amount. As the text and structure of Section 1437 make clear, however, Subsection (D) does no such thing. To the extent they apply, Subsections (A) and (D) impose minima and maxima, respectively — that is, they supplement, and only selectively supplant, Section 1437a(a)(1)'s default rule for a family's rent payment, which Section 1437f(t)(1) says "shall" apply to Enhanced Voucher assistance by way of Section 1437f(o). In other words, Subsections (A) and (D) do not displace Section 1437a(a)(1) altogether. Instead, the subsections interact: first, by setting a minimum payment for Enhanced Voucher recipients, and then by adding an *maximum* payment for those Enhanced Voucher recipients who experience a significant decline in income.

Under the statutory scheme as a whole, therefore, a recipient of Enhanced Voucher assistance "shall pay" the higher of thirty percent of her monthly adjusted income or ten percent of her monthly income, rounded to the nearest dollar, as a contribution towards her monthly rent obligation — unless those calculations would yield a dollar amount less than what she paid at the time her building was converted to market-rate housing, in which case, she must pay that dollar amount. Then, despite all of that, if the tenant experiences a "significant decline" in income, her rent payment must not exceed the greater of thirty percent of her monthly income or the

percentage of monthly income she had paid at the time of conversion. But because neither Subsection (A) nor Subsection (D) displaces Section 1437a(a)(1)'s general formula, Section 1437a(a)(1)'s prescribed payment obligation continues to govern, provided that it is consistent with the minima and maxima imposed by Subsections (A) and (D). At all times, that is, an Enhanced Voucher recipient's rent "shall be" prescribed by Section 1437a(a)(1) — except that it may not be less than the minimum prescribed by Section 1437f(t)(1)(A) and, in the event of a sufficient decline in income, more than the maximum prescribed by Section 1437f(t)(1)(D).

Rodriguez's experience illustrates both how Congress intended the statutory scheme to work and how HUD has misconstrued it. At the time Rodriguez's landlord converted his building to market-rate housing, Rodriguez's monthly rent payment was $671, or eighty-six percent of his monthly adjusted income of $780. *See* Am. Compl. ¶ 35. Under the formula set forth in Section 1437a(a)(1) — which applies by way of the interplay between Section 1437f(o) and (t) and — that would mean that his rent post-conversion should have been the higher of thirty percent of his adjusted monthly income or ten percent of his unadjusted monthly income. But because of Section 1437f(1)(A), Rodriguez's rent could not be lower than $671 — the dollar amount that he paid at the time of conversion — and that is the rent that he was charged. *See* Am. Compl. ¶ 36. A few years later, when Rodriguez's adjusted monthly income dropped to $352 — on HUD's view (which is not challenged here), a "significant" decline within the meaning of Section 1437f(t)(1)(D) — Subsection (D)'s conditional maximum kicked in. Thus, while Section 1437a(a)(1)'s formula continued to apply, he could not be required to pay more than the greater of thirty percent of his monthly income or the percentage of his monthly income that he was paying in rent at the time of conversion, which was eighty-six percent. As eighty-six

percent is obviously greater than thirty percent, HUD calculated Rodriguez's new maximum rent payment to be eighty-six percent of his monthly income, or $303. *See id.* ¶ 37.

That much was consistent with the statutory scheme. But then Rodriguez's income went up again — to the point that eighty-six percent of his adjusted monthly income was $1400 (implying that his adjusted monthly income was $1628). *Id.* ¶ 38. On HUD's interpretation, Subsection (D) continued to prescribe the rent formula, and thus his rent was set at $1400. In doing so, however, HUD ignored the fact that the background rule — that Rodriguez "shall pay as rent" the greater of thirty percent of adjusted monthly income or ten percent of unadjusted monthly income — still governed, subject only to the minima and maxima set forth in Section 1437f(t)(1)(A) and (D). Thirty percent of $1628, rounded to the nearest dollar, is $488 — less than Rodriguez's conversion-date rent payment of $671 — so under Subsection (A), his rent payment should have been at least $671. Assuming without deciding that Subsection (D) continued to apply to Rodriguez even after his income increased, however, Subsection (A)'s minimum could raise Rodriguez's rent payment only to the extent that it also complied with Subsection (D)'s maximum. Subsection (D) says that Rodriguez's rent payment could not exceed the greater of thirty percent of his monthly income ($488) or the conversion-date percentage, eighty-six percent ($1400) — making the new maximum $1400. But $671 — the rent payment required by applying Subsection (A)'s minimum to the figure that Section 1437a(a)(1) would otherwise impose — *is* less than $1400. It therefore does *not* "exceed the greater of 30 percent or the percentage of income paid at the time of the eligibility event for the project," and is thus fully compliant with Subsection (D). Based on HUD's erroneous interpretation of Section 1437f(t), therefore, Rodriguez has been paying $729 more in rent than he is required by statute to pay.

14

## B. Relief

Having concluded that HUD's 2001 Notice is inconsistent with the statute, the Court turns to the question of relief. With respect to the Federal Defendants, although Plaintiffs seek several forms of relief in their Amended Complaint — a declaratory judgment, an injunction requiring Defendants to recalculate Plaintiffs' rent payments, an injunction requiring Defendants to issue "retroactive subsidy credits as appropriate" to make up for the rent overcharge imposed on them by HUD's unlawful formula, and attorney's fees and costs, *see* Am. Comp. 16 — they request only a declaratory judgment in their summary judgment briefing. *See* Pls.' Mem. 34; Docket No. 93 ("Pls.' Reply"), at 10. As to Rodriguez and Pichardo, that request is plainly well founded, as granting a declaratory judgment settles the primary legal dispute among the parties and may even "finalize the controversy" without further need for judicial intervention. *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003) (per curiam) (discussing the factors to consider in deciding whether to grant declaratory relief). Furthermore, there is no indication that Plaintiffs seek a declaratory judgment merely as an opportunistic procedural measure or that by awarding such a judgment the Court would encroach on another sovereign legal system. *See id.* Finally, at least in the first instance, a declaratory judgment provides a "less formidable alternative to injunctive relief." *City of Rome, N.Y. v. Verizon Commc'ns, Inc.*, 362 F.3d 168, 174 n.3 (2d Cir. 2004). That is, armed with a judgment declaring their rights under the Housing Act, Rodriguez and Pichardo may not need additional coercive relief. Accordingly, the Court will enter judgment declaring their statutory rights against the Federal Defendants — and reserve judgment on the question of other relief.

With respect to Pinnock, however, the Court concludes that declaratory relief is not warranted — at least not on the present record. While the Court has broad discretion to award

15

declaratory relief, an exercise of that discretion must await a "specific dispute over imminent activity." *Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 409 (S.D.N.Y. 2012). The record does not indicate that such a dispute exists with respect to Pinnock. As of June 2017, Pinnock was required to pay $603 in monthly rent — less than the dollar amount she was paying at the time of conversion because she was concededly subject to Subsection (D)'s maximum at that time. *See* Ruiz Decl. Ex. E, at 11; Am. Compl. ¶ 43. A proper interpretation of the statute would have yielded the same amount. Recognizing this, Pinnock alleges in the Amended Complaint that she will find herself in the same position as the other Plaintiffs "[a]s soon as she begins collecting her Social Security benefits," but she does not say when that will be. Am. Compl. ¶ 47. In the absence of such evidence, the Court is unable to determine whether her claim is "of sufficient immediacy . . . to warrant the issuance of a declaratory judgment." *Velvet Underground*, 890 F. Supp. 2d at 408 (internal quotation marks omitted). The Court will therefore deny Plaintiffs' motion for summary judgment with respect to Pinnock and dismiss her claims, both without prejudice to refiling or renewal if and when her claims ripen into a "specific dispute over imminent activity." *Id.* at 409.

In addition, the Court concludes that there is no basis or need to order relief against the City Defendants, for two independent reasons. First, to the extent that Plaintiffs bring independent claims against the City Defendants, those claims fail as a matter of law. HPD, as a New York City department, "lack[s] the capacity to be sued." *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008) (per curiam); *see* N.Y.C. Charter § 396; *Artec Constr. & Dev. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, No. 15-CV-9494 (KPF), 2017 WL 782911, at *4 (S.D.N.Y. Feb. 27, 2017) (holding that HPD is a "non-suable City agenc[y]," any claims against which "must be brought instead against the City"); *Garanin v. N.Y.C. Hous. Pres. &*

16

*Dev.*, No. 15-CV-3169 (AJN), 2016 WL 1690301, at *5 (S.D.N.Y. Mar. 30, 2016) (same), *aff'd*, 673 Fed. App'x 122 (2d Cir. 2016). And whether or not that principle extends to the claims against Interim Commissioner Enderlin, which are brought against him in his official capacity, *see, e.g.*, *Barricelli v. City of New York*, No. 15-CV-5273 (LTS), 2016 WL 4750178, at *8 (S.D.N.Y. Sept. 12, 2016) (dismissing official-capacity claims against a New York City agency commissioner on the ground that she was not a suable entity); *accord Allen v. Mattingly*, No. 10-CV-667 (SJF), 2011 WL 1261103, at *14 (E.D.N.Y. Mar. 29, 2011), *aff'd*, 478 Fed. App'x 712 (2d Cir. 2012), Plaintiffs have abandoned any claims against him by omitting any reference to him (or his predecessor), let alone the basis for their claims against him, in their opposition to the City Defendants' motion for summary judgment, *see, e.g.*, *Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) (holding that a court may deem a claim to be abandoned where the party fails to mention the claim in opposition to a summary judgment motion); *accord Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016).

Second, and in any event, there appears to be no need to grant relief separately against the City Defendants. Plaintiffs seek only prospective relief from the City Defendants. *See* Docket No. 94, at 6 ("Plaintiffs are not seeking damages against HPD based on its reliance on HUD's rule; Plaintiffs are simply seeking injunctive relief [against HPD] . . . ."). Yet the City Defendants represent that "HPD lacks discretion to deviate from HUD's regulations and requirements regarding rent calculations for Enhanced Voucher holders." Docket No. 73, at 15. It follows that any relief against the City Defendants would be superfluous given the declaratory judgment granted against the Federal Defendants. That is, with HUD bringing its interpretation of the Housing Act into line with the Court's Opinion and Order, HPD will presumably follow suit. For similar reasons, it cannot be said that Plaintiffs would suffer irreparable harm in the

17

absence of injunctive relief against the City Defendants.  *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010) ("[A] permanent injunction is not now needed to guard against any present or imminent risk of likely irreparable harm.").

## CONCLUSION

For the reasons given and to the extent set forth above, Plaintiffs' cross-motion for summary judgment is GRANTED in part and DENIED in part; the City Defendants' motion for summary judgment is GRANTED; and the Federal Defendants' motion for summary judgment is GRANTED as to Pinnock and DENIED as to Rodriguez and Pichardo.  In light of that, and given that there is no need for the Court to reach Plaintiffs' constitutional claims, the second, third, and fourth Causes of Action in Plaintiffs' Amended Complaint are DISMISSED without prejudice, and both HPD and its Commissioner are dismissed as parties to this action.  (In light of that, there is no need to formally substitute Interim Commissioner Enderlin on the docket.)  The Court will modify the caption of the case accordingly.

With respect to the Federal Defendants, the Court grants Plaintiffs' request for a declaratory judgment with respect to Rodriguez and Pichardo, dismisses Pinnock's claims without prejudice, and reserves judgment on whether any additional relief is warranted.  Plaintiffs and the Federal Defendants shall promptly confer with respect to the need or basis for any additional relief (aside from attorney's fees and costs) and, no later than **April 12, 2019**, submit a joint letter to the Court addressing those issues and, as appropriate, how the Court should proceed.  If the parties agree that judgment should be entered on the basis of this Opinion and Order, *see* Fed. R. Civ. P. 54(b), they should submit a proposed judgment by the same date.  Finally, unless and until the Court orders otherwise, Plaintiffs shall file any application for attorney's fees and costs within thirty days of the judgment in this case becoming final and not

appealable; any opposition shall be filed within two weeks of the application; and any reply shall be filed within one week of the opposition.[9]

The Clerk of Court is directed to amend the caption as set forth above; to terminate Pinnock, HPD, and Maria Torres-Springer as parties to this action; and to terminate Docket Nos. 71, 75, and 81.

SO ORDERED.

Dated: March 29, 2019
New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[9] Before filing any application for fees and costs, however, Plaintiffs shall confer with the Federal Defendants in an effort to reach agreement.