UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT RODRIGUEZ, ELAINE PINNOCK, and JOVANNY PICHARDO,

                Plaintiffs,

                v.

BEN CARSON, in his capacity as the Secretary of the UNITED STATES DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; the UNITED STATES DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; ERIC ENDERLIN, in his capacity as Interim Commissioner for the NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION & DEVELOPMENT; and the NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION & DEVELOPMENT,

                Defendants.

17 Civ. 4344 (JMF)

# THE FEDERAL DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2714
Fax: (212) 637-2686

CASEY K. LEE
Assistant United States Attorney
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ..............................................................................................................2

I.      Funding Scheme for Section 8's Housing Choice Voucher Program......................2

          A.      HUD's Contractual Relationship with HPD ................................................3

          B.      Congressional Funding for the Housing Choice Voucher Program ............5

II.     Plaintiffs' Demand for Reimbursement or Retroactive Subsidy Credits for
        Past Rent Overpayments ..........................................................................................8

ARGUMENT ....................................................................................................................9

I.      Plaintiffs' Demand for Reimbursement of or Retroactive Credits for Past
      Rent Overpayments Falls Outside the Scope of Relief Available in this Case .......9

          A.      Plaintiffs' Request Is Moot Because It Substantively Seeks Funds
                That Have Already Been Disbursed or Obligated .....................................10

          B.      Any Request for Payments from Another Source Seeks
                Compensatory Relief Outside the Scope of the APA ................................11

II.     HUD Has No Authority Under Its Contract with HPD to Direct It to
       Reimburse or Issue Credits for Plaintiffs' Alleged Rent Overpayments
       in this Case ..............................................................................................................14

CONCLUSION................................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Baker v. Cincinnati Metro. Hous. Auth.*,
   675 F.2d 836 (6th Cir. 1982) .................................................................................... 3

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ................................................................................................... 9

*Campbell-Ewald Co. v. Gomez*,
   136 S. Ct. 663 (2016) ................................................................................................. 9

*City of Houston v. HUD*,
   24 F.3d 1421 (D.C. Cir. 1994) ............................................................................ 11, 12

*Cty. of Suffolk v. Sebelius*,
   605 F.3d 135 (2d Cir. 2010) ............................................................................... 10, 11

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................................. 14

*Lane v. Pena*,
   518 U.S. 187 (1996) ................................................................................................... 9

*Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*,
   397 F.3d 77 (2d Cir. 2005) ....................................................................................... 10

*Modoc Lassen Indian Hous. Auth. v. HUD*,
   881 F.3d 1181 (10th Cir. 2017) ............................................................................... 12

*OPM v. Richmond*,
   496 U.S. 414 (1990) ..................................................................................... 11, 12, 13

*Ward v. Brown*,
   22 F.3d 516 (2d Cir. 1994) ......................................................................................... 9

**Constitution and Statutes**

U.S. Const. art. I, § 9, cl. 7 ............................................................................................. 12

5 U.S.C. § 702 ............................................................................................................ 1, 9

5 U.S.C. § 704 ............................................................................................................... 13

31 U.S.C. § 1341 ........................................................................................................... 13

31 U.S.C. § 1501 ........................................................................................................... 11

42 U.S.C. § 1437 ........................................................................................................... 3

42 U.S.C. § 1437f ...................................................................................................... 3, 8

42 U.S.C. § 3537a ........................................................................................................ 12

42 U.S.C. § 3545 .......................................................................................................... 13

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (2019) .................. 5, 6, 7

**Rules**

Fed. R. Civ. P. 54 ............................................................................................................ 8

**Regulations**

24 C.F.R. § 982.1 ............................................................................................................ 3

24 C.F.R. § 982.151 ........................................................................................................ 3

24 C.F.R. § 982.153 ........................................................................................................ 4

24 C.F.R. § 982.154 ........................................................................................................ 5

**Other Authorities**

Gov't Accountability Office, 2 *Principles of Federal Appropriations Law* (3d ed. Feb. 2006) .. 11

PIH Notice 2019-08: Implementation of the Federal Fiscal Year (FFY) 2019 Funding Provisions for the Housing Choice Voucher Program 3 (Apr. 18, 2019) .................................................. 6, 7

Defendants Secretary Ben Carson, sued in his official capacity, and the United States Department of Housing and Urban Development ("HUD") (together, the "Federal Defendants"), by their attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in opposition to Plaintiffs Robert Rodriguez and Jovanny Pichardo's ("Plaintiffs'") motion for a permanent injunction ordering HUD to (1) reimburse Plaintiffs, or provide them with a retroactive rent subsidy credit, in the amount of their alleged past rent overpayments; and (2) direct the New York City Department of Housing Preservation and Development ("HPD") to "take appropriate and necessary actions to effectuate the reimbursement." Dkt. No. 113 ("Pls.' Br.") at 7; *see also* Dkt. No. 111.

## PRELIMINARY STATEMENT

Plaintiffs' demand for rent reimbursements (or rent subsidy credits) runs into an insuperable barrier: the unavailability of the specific funds they seek in their motion. Plaintiffs acknowledge that any monetary relief awarded under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 et seq., is strictly limited to the specific thing to which they are entitled, and cannot take the form of compensatory damages. By extension, if the "thing" Plaintiffs are allegedly entitled to has been exhausted or is otherwise unavailable, then a court is powerless to provide the monetary relief Plaintiffs seek, and the request must be denied as moot.

That is precisely what happened here. Plaintiffs essentially contend that they should have received more rental assistance under the Housing Choice Voucher program than they did in 2011 to 2019, and seek such funds in the amount of alleged rent overpayments from that time period. But the congressionally-appropriated funds for such assistance in 2011 through 2018 are no longer available. Further, the most recent 2019 appropriation for applicable housing assistance payments under the Housing Choice Voucher program have already been obligated to

public housing authorities (including HPD) pursuant to a formula mandated by Congress, and cannot be used to pay funds to Plaintiffs. Under applicable Supreme Court and Second Circuit precedent, these circumstances require denying Plaintiffs' present motion as moot.

Nor can Plaintiffs seek relief through another payment source. Such a request no longer seeks the specific thing to which Plaintiffs are allegedly entitled, and instead is precisely the type of compensatory damages that falls outside the scope of equitable relief available under the APA. Moreover, relief through another payment source would run afoul of the Appropriations Clause of the Constitution, which provides that no payment can be made from the United States Treasury absent an appropriation by Congress. Thus, in the absence of available appropriated funds (here, funds for applicable rental assistance for the years at issue), a court cannot order the federal government to provide relief through a different payment source, since the use of that source to provide Plaintiffs with their requested relief has not been approved by Congress.

For these reasons, Plaintiffs' motion for a permanent injunction should be denied as moot.

## BACKGROUND

Plaintiffs seek an injunction against the Federal Defendants directing them to either reimburse or provide retroactive rent assistance credits for alleged rent overpayments from certain periods in 2016 to 2019 for Plaintiff Rodriguez, and in 2011 to 2019 for Plaintiff Pichardo. Pls.' Br. 2-4, 7. The following provides background relevant to Plaintiffs' motion.

### I. Funding Scheme for Section 8's Housing Choice Voucher Program

As the Court previously noted, the Section 8 housing program "is funded by the federal government, but administered by local public housing authorities—in New York City's case, by HPD." Dkt. No. 105 at 3-4 ("Opinion" or "Op."). Addressing Plaintiffs' present motion requires an understanding of both the funding scheme for the "tenant-based" assistance provided under

Section 8, *see* Op. 4 (*i.e.*, the Housing Choice Voucher ("HCV") Program, *see* 24 C.F.R. § 982.1(a)), and the contractual terms under which HUD grants funding to HPD to provide such assistance.

      A.      **HUD's Contractual Relationship with HPD**

The "United States Housing Act of 1937, of which the Section 8 program is a part, encourages local decision-making: It is the policy of the United States . . . to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs." *Baker v. Cincinnati Metro. Hous. Auth.*, 675 F.2d 836, 839 (6th Cir. 1982). HUD aims "to assist States and political subdivisions of States to remedy . . . the acute shortage of decent and safe dwellings for low-income families," 42 U.S.C. § 1437(a)(1)(A), and "to address the shortage of housing affordable to low-income families," *id.* § 1437(a)(1)(B). Accordingly, "[t]he HCV program is generally administered by State or local governmental entities called public housing agencies (PHAs)." 24 C.F.R. § 982.1(a)(1). HUD, in turn, provides both "housing assistance funds to the PHA," and "funds for PHA administration of the program." *Id.*

To provide such funding, HUD "is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units." 42 U.S.C. § 1437f(b)(1). "An annual contributions contract (ACC) is a written contract between HUD and a PHA." 24 C.F.R. § 982.151(a)(1). "Under the ACC, HUD agrees to make payments to the PHA, over a specified term, for housing assistance payments to owners . . . ." *Id.* Generally, HUD and a PHA enter into a "consolidated ACC," *i.e.*, a single "consolidated contractual document" that "covers funding for the PHA's HCV program." *Id.* § 982.151(a)(2). The consolidated ACC lists each commitment of funds (the "funding increment") authorized and appropriated by Congress to be paid by HUD to the PHA (the "budget authority"). *Id.* 982.151(a)(2), (b)(1). In exchange, "[t]he

3

PHA agrees to administer the program in accordance with HUD regulations and requirements." *Id.* "The PHA must [also] comply with the consolidated ACC." *Id.* § 982.153.

HUD and HPD are parties to a consolidated ACC.[1] Declaration of Miguel Fontanez ("Fontanez Decl.") ¶ 19. That agreement strictly limits the ways in which HUD may direct a PHA's use of funds. HUD's contractual authority to take action against HPD under the consolidated ACC are primarily threefold: *First*, to reduce the amount of funding HUD provides to HPD under the consolidated ACC, if HUD determines that HPD has failed to comply with any obligations under the consolidated ACC, *see* Consol. ACC § 6(a); *second*, if HUD determines that HPD "is not adequately administering any Section 8 program in accordance with HUD requirements, HUD may" (among other things) "[d]irect [HPD] to use the funds to improve administration of the Section 8 program or for reimbursement of ineligible expenses," *id.* § 12(c); *third*, upon written notice, to "take possession of all or any [HPD] property, rights or interests in connection with a program, including funds held by a depositary, program receipts, and rights or interests under a contract for housing assistance payments with an owner" if HUD determines that HPD has defaulted in at least one of four specified ways, *see id.* § 15(a). Absent HUD's determination of a PHA's inadequate administration of a Section 8 program, or a default under the consolidated ACC, nothing in the consolidated ACC provides HUD with any authority to direct HPD to make any payments, or grant any rent subsidy credits. *See* Fontanez Decl. ¶ 22.

In addition, the consolidated ACC provides in relevant part that "[a] family that is eligible for housing assistance under this consolidated ACC is not a party to or third party beneficiary of the consolidated ACC. Consol. ACC § 18(a). Further, "[n]othing in the

---

[1] A copy of a standard form consolidated ACC for the HCV Program is available at https://www.hud.gov/sites/documents/52520.pdf [hereinafter "Consol. ACC"].

consolidated ACC shall be construed as creating any right of any third party to enforce any provision of this consolidated ACC, or to assert any claim against HUD or [HPD]." *Id.* § 18(b).

PHAs that have unspent surplus funds from prior calendar years place all of those funds into an "ACC reserve account." Fontanez Decl. ¶ 20; *see also* 24 C.F.R. § 982.154. PHAs can use ACC reserve account funds for any purpose consistent with their current year's use of HAP renewal funding. Fontanez Decl. ¶ 20. Reimbursement of rent paid by a PHA to a tenant for an improperly calculated tenant rent share would be an authorized use of a PHA's HAP funds. *Id.* ¶ 5. As of December 31, 2018, HPD had approximately $45.6 million in its ACC reserve account. *Id.* ¶ 21.

### B. Congressional Funding for the Housing Choice Voucher Program

Congress provides funding for the HCV Program through periodic appropriations for such use, the most recent of which occurred in the Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (2019) [hereinafter the "2019 Act"]. *See* Fontanez Decl. ¶ 2. Congress provides appropriations for housing assistance payments ("HAP") renewal funding, to be used to fund "renewals of expiring section 8 tenant-based annual contributions contracts (including renewals of enhanced vouchers under any provision of law authorizing such assistance under section 8(t) of the [Housing] Act)," 2019 Act, 133 Stat. at 434. In this case, because both Plaintiffs were accepted into the enhanced section 8 voucher program prior to the funding years for the alleged rent overpayments they seek in this motion (*i.e.,* Plaintiff Rodriguez, who seeks additional HAP for 2016 to 2019, was accepted into the program in 2004, *see* Dkt. No. 83 ¶ 6; Plaintiff Pichardo, seeking additional HAP for 2011 to 2019, was accepted into the program in 2005, *see* Dkt. No. 84 ¶ 5), such additional rent assistance would come from Congress's appropriations for HAP renewal funding from 2011 to 2019. *See* Fontanez Decl. ¶¶ 3, 6.

5

For 2011 through 2018, no HAP renewal funding for HCV programs is available. *See id.* ¶ 11. With respect to 2011 through 2017, all HAP renewal funding has already been disbursed to PHAs. *Id.* Regarding 2018, all but about $898,921 of HAP renewal funding has already been disbursed, and this remaining amount was committed to redistribution to all PHAs on a prorated basis in 2019 to minimize the underfunding in HAP renewal funds for PHAs under the 2019 Act's appropriation. *Id.*

For 2019, the 2019 Act directed HUD to provide all but up to $100 million[2] of appropriated HAP renewal funding (totaling over $20.3 billion) to PHAs pursuant to a funding allocation formula specified in the Act. *Id.* ¶ 7; 2019 Act, 133 Stat. at 434. That formula (slightly simplified) provides that, for calendar year 2019, HUD "shall provide renewal funding for each [PHA]" based on how much that PHA spent last year (as entered into a central data and management system known as the Voucher Management System), plus a factor established by the HUD Secretary to account for inflation. Fontanez Decl. ¶ 7; 2019 Act, 133 Stat. at 434. The 2019 Act then requires HUD to calculate and apply a "proration" factor. Fontanez Decl. ¶ 8; 133 Stat at 434. Essentially, the proration factor reflects the difference between the total HAP renewal funding amount for which all PHAs running HCV programs would be eligible (per the above-described calculation), to the actual amount of such funding appropriated by Congress.

---

[2] The 2019 Act authorizes HUD to set aside this $100 million sum to provide additional HAP renewal funding to PHAs for four express purposes, and invests the Secretary with complete discretion on determining how to distribute this funding. Fontanez Decl. ¶ 15; *see also* 2019 Act, 13 Stat. at 435. One of those four set-aside categories is "unforeseen circumstances," defined as "an occurrence within or after the re-benchmarking period which the PHA could not reasonably have anticipated and which was out of the PHA's control." Fontanez Decl. ¶ 16; PIH Notice 2019-08 at 14. The application deadline for set-aside funding due to unforeseen circumstances in calendar year 2019 was May 30, 2019, at 5:00 p.m. PIH Notice 2019-08 at 15. Set-aside funding is provided on a competitive, first-come, first-serve basis. Fontanez Decl. ¶ 17. HUD has no record of any application by HPD seeking set-aside funding for unforeseen circumstances arising from this litigation. *Id.* ¶ 18.

*See* Fontanez Decl. ¶ 8; PIH Notice 2019-08: Implementation of the Federal Fiscal Year (FFY) 2019 Funding Provisions for the Housing Choice Voucher Program 3 (Apr. 18, 2019), *available at* https://www.hud.gov/sites/dfiles/PIH/documents/PIH-2019-08.pdf. In the event that the HCV programs are "underfunded"—that is, the total HAP renewal funding eligibility for all PHAs exceeds the funding appropriated by Congress—then the proration factor applies to reduce the HAP renewal funding each PHA will receive so that funding disbursed will fall within the available congressional appropriation. Fontanez Decl. ¶ 8; PIH Notice 2019-08 at 3.

As specified in the 2019 Act, these appropriations (other than the $100 million "set-aside") can only be distributed to each PHA in the amounts dictated by the above-described formula. *See* 2019 Act, 133 Stat. at 434; Fontanez Decl. ¶ 10. Each PHA's HAP renewal funding award for its HCV program is then remitted by HUD to each of the PHAs on a monthly basis pursuant to Treasury cash management procedures, so that PHAs may provide rental subsidies to their existing HCV program participants' landlords, or to prospective participants' landlords who are eligible to enter the HCV program if vouchers become available as the year progresses. Fontanez Decl. ¶ 9.

HUD's Office of Voucher programs completed calculation of 2019 HAP renewal funding for each PHA on or about April 16, 2019. *Id.* ¶ 12. HUD completed obligating all renewal funding for the PHAs participating in the HCV program (including HPD) on May 8, 2019. *Id.* ¶ 4. For January through May 2019, renewal funding was obligated prior to the April 16, 2019, calculation date by estimating the renewal awards through a preliminary formula. *Id.* The current obligation of 2019 HAP renewal funds is up through October 2019. *Id.* Any obligations for November and December 2019 will come from a future FY 2020 appropriations act, or a continuing resolution. *Id.*

**II.     Plaintiffs' Demand for Reimbursement or Retroactive Subsidy Credits for Past Rent Overpayments**

After issuing the Opinion, on April 16, 2019, the Court entered a judgment pursuant to Fed. R. Civ. P. 54(b), which (among other things) granted a declaratory judgment to Plaintiffs and remanded the matter for further action within 45 days consistent with the Opinion. Dkt. No. 107 at 2. The judgment ordered Plaintiffs to file any motion for further relief within seven days of the expiry of the 45-day deadline. *Id.*

On May 23, 2019, the Federal Defendants issued Notice PIH 2019-12, which "revises the calculation for the enhanced voucher minimum rent for certain families whose incomes increase after the family experienced a significant decrease in income" pursuant to the Opinion, and "supersedes the previous [at-issue] calculation set forth . . . in HUD Notice PIH 2001-41." *See* Dkt. No. 108-1 at 1; *see also* Dkt. No. 108. Under the new notice, the revised calculation was to be applied prospectively, not retroactively. Dkt. No. 108-1 at 4. HUD issued a letter to HPD on May 29, 2019, directing compliance with the new notice within 30 days from the date of the letter. *See* Dkt. No. 108-2 at 1.[3]

Plaintiffs are now seeking further relief from this Court, however, in the form of an injunction requiring HUD to reimburse or provide a retroactive adjustment for Plaintiffs' alleged past rent overpayments resulting from HUD's prior interpretation of 42 U.S.C. § 1437f(t). Dkt. No. 108 at 2. That relief should not be granted, for the reasons stated herein.

---

[3] HPD subsequently requested a 90-day extension of its deadline to comply with Notice PIH 2019-12, from June 28, 2019, to September 26, 2019. Based on HPD's representation that any rent adjustments pursuant to the new notice would be retroactive to July 1, 2019, Plaintiffs did not object to the requested extension. HUD granted the extension request on June 26, 2019.

**ARGUMENT**

Plaintiffs' demand for monetary relief rests on two erroneous assumptions: *First*, that HUD has congressionally appropriated funds that are available to pay the reimbursements Plaintiffs seek; *second*, that HUD has the authority to direct HPD to pay, process, or otherwise "effectuate" such reimbursements. As explained below, both premises are incorrect. Plaintiffs' request for rent payment reimbursements should therefore be denied.

**I. Plaintiffs' Demand for Reimbursement of or Retroactive Credits for Past Rent Overpayments Falls Outside the Scope of Relief Available in this Case**

It is axiomatic that the United States cannot be sued without its consent, and that any waiver of sovereign immunity "will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996) ("To sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims"). Plaintiffs have sued under the APA. Although the APA provides the requisite waiver of sovereign immunity, it does so only insofar as the action seeks "relief other than money damages." 5 U.S.C. § 702. Any claim for compensatory damages under the APA is therefore barred. *Ward v. Brown*, 22 F.3d 516, 520 (2d Cir. 1994).

Plaintiffs are only half right when they distinguish "specific relief" from money damages and point out that the former is equitable relief properly sought under the APA. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *see also* Pls.' Br. 4-5. Under the APA, an action for specific relief to require the Government to remit money it is statutorily obligated to pay can be maintained. *Bowen*, 487 U.S. at 893-895. But the counterweight to that rule is that Plaintiffs may only seek "the recovery of specific . . . monies" that are "the very thing to which [Plaintiffs] [are] entitled," *id.* at 893, 895 (emphasis omitted), and cannot obtain "monetary compensation" "to *substitute* for a suffered loss," *id.* (quotation marks omitted). In this case, the "thing"

Plaintiffs seek—certain funds appropriated for rental assistance—is no longer available. Nor can Plaintiffs request funds from other sources, since (among other things) such relief would comprise compensatory damages that cannot be recovered under the APA.

### A. Plaintiffs' Request Is Moot Because It Substantively Seeks Funds That Have Already Been Disbursed or Obligated

Simply put, Plaintiffs' motion is moot because it seeks congressionally appropriated funds that are no longer available. "Article III of the Constitution limits . . . federal-court jurisdiction[] to Cases and Controversies." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005) (quotation marks omitted). At the "uncontroverted core" of this case-or-controversy requirement "lies the principle that, at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Id.* (quotation marks omitted). Thus, "[w]hen the issues in dispute between the parties are no longer live, a case becomes moot, and the court . . . loses jurisdiction over the suit, which therefore must be dismissed." *Id.* (quotation marks and citation omitted). In other words, a case is moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (quotation marks omitted).

Applying these principles here, Plaintiffs' motion for injunctive relief must be dismissed as moot. Plaintiffs seek (via the APA) reimbursements from HUD of alleged rent overpayments between 2011 and June 2019—or put slightly differently, additional rental assistance funds that HUD allegedly should have given them in that time period. *See* Pls.' Br. 3-4. Accordingly, the APA "only functions as an effective waiver of the government's sovereign immunity to the extent that plaintiffs seek to force [HUD] to return property to [them], where the *res* at issue is the funds appropriated by Congress for" providing rental assistance to tenants such as Plaintiffs from 2011 to June 2019. *Cty. of Suffolk v. Sebelius*, 605 F.3d 135, 140-41 (2d Cir. 2010). "[I]n

cases challenging an agency's expenditure of funds" (such as the instant motion), "the *res* at issue is identified by reference to the congressional appropriation that authorized the agency's challenged expenditure." *Id.* at 141.

But here, as explained above, the appropriations from which any at-issue rental assistance would have been paid in 2011 through 2018 are unavailable. Fontanez Decl. ¶ 11. Further, the relevant 2019 appropriation has already been obligated and/or disbursed through HUD's ACCs with public housing authorities (including HPD), and the calculation of HCV program benefits. *See id.* ¶¶ 4, 7-9, 12, 14; *see also* 31 U.S.C. § 1501(a)(1) (appropriation obligated in amount specified in "a binding agreement between an agency and another person"); Gov't Accountability Office, 2 *Principles of Federal Appropriations Law* at 7-3 to 7-4 (3d ed. Feb. 2006), *available at* https://www.gao.gov/assets/210/202819.pdf.

These facts render Plaintiff's motion moot. "Where, as here, the congressional appropriations relating to the funds sought by private litigants have been lawfully distributed— and therefore exhausted—by a federal agency, courts lack authority to grant effectual relief in the context of an Article III case or controversy." *Cty. of Suffolk*, 605 F.3d at 138. Similarly, "once the relevant funds have been obligated, a court cannot reach them in order to award relief." *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994); *see id.* at 1427 (demand for relief moot where HUD "contractually obligated its entire . . . appropriation from Congress"). Plaintiffs' motion should therefore be denied as moot.

### B. Any Request for Payments from Another Source Seeks Compensatory Relief Outside the Scope of the APA

Plaintiffs cannot circumvent the unavailability of appropriated funds by seeking payment from another source. "To seek funds from another source is to seek compensation rather than the specific property the plaintiff aims to recover," and thus "falls outside the scope of the waiver of

11

sovereign immunity arising from § 702 of the APA." *Cty. of Suffolk*, 605 F.3d at 141; *accord City of Houston*, 24 F.3d at 1428; *Modoc Lassen Indian Hous. Auth. v. HUD*, 881 F.3d 1181, 1196-97 (10th Cir. 2017).

Moreover, any order directing reimbursement of Plaintiffs' claimed rent overpayments from another source would run afoul of the Appropriations Clause of the Constitution, which states that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. That "straightforward and explicit command" "means simply that no money can be paid out the Treasury unless it has been appropriated by an act of Congress." *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quotation marks omitted). By extension, the Court cannot issue an injunction ordering HUD to pay the at-issue rent overpayments from a source other than the now-unavailable appropriations. "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Richmond*, 496 U.S. at 425. As a result, a court, even under its equity powers, "cannot grant [Plaintiffs] a money remedy that Congress has not authorized." *Id.* at 426 ("Courts of equity can no more disregard . . . constitutional requirements and provisions than can courts of law.") (quotation marks omitted).

Plaintiffs' reliance on *Bowen* (*see* Pls.' Br. 4-5) does not change this result. "Nothing in *Bowen* or its progeny even obliquely addresses the question of . . . fully obligated appropriations, and it is indisputable that *Bowen* did not amend the Constitution." *City of Houston*, 24 F.3d at 1428; *see also Modoc Lassen*, 881 F.3d at 1197 n.11 (issue of whether payment from source other than relevant appropriation is an award of "money damages" "simply didn't arise in *Bowen*"). "Whatever changes *Bowen* may have wrought in the law, it certainly did not repeal the

Appropriations Clause of the Constitution." *City of Houston*, 24 F.3d at 1427. *Bowen* therefore offers no path to side-step an "elementary constitutional stumbling block," to wit, that "[w]hen the relevant appropriation has . . . been fully obligated, as in this case, the federal courts are without authority to provide monetary relief." *Id.* at 1428.

Finally, "it would be most anomalous for a judicial order to require a Government official . . . to make an extrastatutory payment of federal funds." *Richmond*, 496 U.S. at 430. Under the Antideficiency Act, 31 U.S.C. § 1341 et seq., "[i]t is a federal crime, punishable by fine and imprisonment, for any Government officer or employee to knowingly spend money in excess of that appropriated by Congress." *Richmond*, 496 U.S. at 430 (citing 31 U.S.C. §§ 1341, 1350). Consequently, "[i]f an executive officer on his own initiative had decided that, in fairness, [Plaintiffs] should receive benefits despite the statutory bar, the official would risk prosecution," and "a court order . . . effect[ing] the same result" is equally problematic. *Id.* In addition, the HUD Reform Act, 42 U.S.C. §§ 3537a, 3545, not only requires the publication of notice of availability of, application procedures for, and selection criteria for assistance funds, *id.* § 3545(a)(1)-(3), but also requires (in this instance) that any award or allocation of assistance be made "in response to a written application in a form approved in advance by [HUD]," *id.* § 3545(a)(4). But a court-ordered injunction directing the payment of funds to Plaintiffs would, at a minimum, run afoul of the written application requirement. *See Richmond*, 496 U.S. at 426 ("Courts of equity can no more disregard statutory . . . requirements and provisions than can courts of law.") (quotation marks omitted).[4]

---

[4] Plaintiffs' motion should also be denied because "[an]other adequate remedy in a court" is available to them, 5 U.S.C. § 704. Although the Court has held that HPD lacks the capacity to be sued, *see* Op. 16, Plaintiffs can seek monetary relief in an action against the City of New York for their alleged rent overpayments. A reimbursement paid to a tenant for an improperly calculated tenant rent share would be a permissible use of a HPD's HAP funds, Fontanez Decl.

13

II. **HUD Has No Authority Under Its Contract with HPD to Direct It to Reimburse or Issue Credits for Plaintiffs' Alleged Rent Overpayments in this Case**

Plaintiffs fundamentally misperceive the regulatory scheme of the HCV Program. As explained above, HUD has no coercive authority over HPD (or for that matter, any local public housing authority). Rather, the parameters under which HUD provides funding to HPD for the HCV program are governed by contract, namely the consolidated ACC. Fontanez Decl. ¶ 19, 22. That agreement provides no basis for ordering HUD to direct HPD to provide the relief Plaintiffs seek in their motion. The only conceivable means by which HUD could direct HPD in such a manner is if HUD determines that HPD has inadequately administered the HCV program, *see* Consol. ACC § 12(c), or defaulted on the consolidated ACC in one of four ways specified in that agreement, *see id.* § 15(a). But HUD has made no such determination on either front, and in any event, even if it made such findings, the decision to direct HPD to use funds in a certain manner pursuant to the relevant terms of the consolidated ACC is HUD's and HUD's alone. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (agency's enforcement decisions is "generally committed to an agency's absolute discretion"). This Court should therefore decline to issue any coercive relief ordering HUD to direct HPD to "effectuate" or otherwise provide rent reimbursements or retroactive subsidy credits.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a permanent injunction.

---

¶ 5, and HPD may use its ACC reserve funds (approximately $45.6 million as of December 31, 2018) for any purpose consistent with their current year's use of HAP renewal funding, *id.* ¶¶ 20-21.

Dated: New York, New York
      July 8, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By:   */s/ Casey K. Lee*
     CASEY K. LEE
     Assistant United States Attorney
     86 Chambers Street, Third Floor
     New York, New York 10007
     Tel.: (212) 637-2714
     Fax: (212) 637-2686
     casey.lee@usdoj.gov